## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

```
---------------------------------------------------x
NORTHROP GRUMMAN SYSTEMS          :
CORPORATION,                      :
2980 Fairview Park Drive,         :
Falls Church, Virginia            :
                                  :
                    Plaintiff,    :
        v.                        :
                                  :
JADM, INC.,                       :          Civil Action No. _____
2049 Route 32                     :
Sykesville, MD 21784              :
(Resident of Carroll County)      :
                                  :
        and                       :
                                  :
ROLF W. RAMELMEIER,               :
11438 High Hay Drive,             :
Columbia, MD 21044                :
(Resident of Howard County)       :
                                  :
                    Defendants.   :
                                  :
---------------------------------------------------x
```

## COMPLAINT

Plaintiff Northrop Grumman Systems Corporation ("Northrop Grumman," or "Plaintiff"), by and through its undersigned counsel, hereby makes this Complaint for Damages against defendants JADM, Inc. ("JADM") and Rolf W. Ramelmeier ("Ramelmeier," and together with JADM, "Defendants"), and respectfully states as follows:

### NATURE OF THE ACTION

1.      This is an action to recover damages in excess of $10 million from Defendants for overpayments they fraudulently obtained from Northrop Grumman by intentionally inflating

natural gas bills. JADM, through its owner and controlling agent Rolf W. Ramelmeier, agreed to provide natural gas to Northrop Grumman and to bill only for the natural gas provided. Despite that agreement, Defendants exaggerated the natural gas usage JADM reported to Northrop Grumman in monthly invoices and fraudulently billed Northrop Grumman for that excess. The practice, which began no later than 2003 and lasted through 2013, violated the parties' explicit agreement for Northrop Grumman to pay only for actual usage as defined in the contract. JADM's reported usage exceeded Northrop Grumman's actual usage by at least 16% every year, and by 57% in one year. The Defendants overbilled Northrop Grumman almost every month for more than ten years, and stopped only after Northrop Grumman uncovered the fraud.

## PARTIES

2.     Plaintiff Northrop Grumman is a corporation organized under the laws of the State of Delaware, with its principal place of business at 2980 Fairview Park Drive, Falls Church, Virginia. Plaintiff maintains four sector headquarters, one of which is its Electronic Systems Sector ("ES") at 1580-A West Nursery Road, Linthicum, Maryland.

3.     Defendant JADM, Inc. is a corporation organized under the laws of the State of Maryland, with its principal place of business at 2049 Route 32, Sykesville, Maryland 21754.

4.     Defendant Rolf W. Ramelmeier is an individual who resides at 11438 High Hay Drive, Columbia, Maryland 21044, and is, upon information and belief, a citizen of Maryland. Upon information and belief, Ramelmeier has owned and controlled JADM at all times relevant hereto.

**JURISDICTION AND VENUE**

5.      The Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332(a)(1) because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.

6.      Venue is proper under 28 U.S.C. § 1391(b) because the Defendants reside in this district and a substantial part of the events or omissions giving rise to the claims occurred in this district.

**FACTUAL BACKGROUND**

7.      Beginning no later than 1996, Northrop Grumman and JADM had an agreement for JADM to supply natural gas to several Northrop Grumman facilities in the Baltimore, Maryland region. JADM was to bill Northrop Grumman only for Northrop Grumman's usage of natural gas, and Northrop Grumman was to pay only for that usage. In early 2014, Northrop Grumman discovered that JADM had exaggerated the usage it reported in nearly every monthly invoice it submitted to Northrop Grumman over a period of more than ten years. Defendants caused Northrop Grumman to overpay by more than $10 million during that period.

8.      With deregulation of natural gas in the early 1990s, it became possible for companies, such as Northrop Grumman, to procure natural gas commodities from fuel companies using the public utility infrastructure. Companies could retain a natural gas broker— an entity licensed by the state that acts as an intermediary in the sale and purchase of gas between fuel companies and retail purchasers—to arrange the delivery and bill for it.

**Northrop Grumman Contracts with JADM for the Supply of Natural Gas**

9.      Beginning no later than 1996, Northrop Grumman retained JADM as its exclusive natural gas broker for several facilities in the Baltimore area, including office buildings, warehouses, and manufacturing centers. JADM conducted its negotiations with Northrop Grumman through Ramelmeier—JADM's owner and controlling agent—who served as the principal contact on behalf of JADM to Northrop Grumman at all times relevant to this Complaint. Northrop Grumman's natural gas requirements varied by facility and season, as some facilities required natural gas solely for heat and others required natural gas to fuel everyday operations.

10.     JADM purported to be a natural gas broker in the State of Maryland. In fact, JADM was not and never has been licensed or registered as a natural gas broker in Maryland.

11.     Pursuant to the contract, JADM was to purchase natural gas from fuel companies and arrange to have the gas transported to Northrop Grumman facilities through the infrastructure owned by the public utility, Baltimore Gas and Electric ("BG&E"). JADM was to bill Northrop Grumman monthly for its usage of natural gas, as measured by the gas actually metered at Northrop Grumman facilities plus an adjustment for line factor loss, which was calculated by BG&E. BG&E reported a monthly figure for line factor loss, which was the same for all of its customers. JADM's monthly invoices were supposed to reflect the precise quantity of natural gas that JADM had actually supplied during the respective month, as metered by BG&E in therms or dekatherms, at a rate per unit specified in the applicable contract. Northrop Grumman was to pay only for its usage of natural gas.

12.    Between approximately 1996 and 2000, the contractual rate was set on a monthly basis based on current commodity pricing. From approximately 2001 through 2014, Northrop Grumman and JADM executed a series of one or two year contract extensions at a fixed rate per unit of gas supplied.

13.    The parties understood that JADM would employ BG&E's meter records to calculate Northrop Grumman's monthly gas consumption. BG&E provided its meter records to JADM and/or JADM's suppliers.

14.    Throughout the period, JADM—acting through Ramelmeier—submitted monthly invoices to Northrop Grumman that identified the month covered, the rate charged per dekatherm, the usage in dekatherms at each facility, and the total charge for that month. Each monthly invoice JADM submitted to Northrop Grumman purported to state Northrop Grumman's actual usage of natural gas during the billing period. This representation was false in virtually every invoice.

15.    Between 2003 and 2013 alone, JADM overcharged Northrop Grumman for more than 13 million therms of natural gas at an excess cost of $11,240,928. JADM's reported usage exceeded Northrop Grumman's actual metered usage by 16% to 57% per year after adjusting for BG&E's reported line loss factor. A summary, showing the amount of overcharges for each year between 2003 and 2013, is attached hereto as **Exhibit A**.

16.    For example, during 2010, JADM submitted 12 invoices to Northrop Grumman, claiming that JADM had provided 5,291,993 dekatherms (5,506,340 reported dekatherms, adjusting for actual BG&E line loss) to Northrop Grumman, and that Northrop Grumman should pay $5,477,213 for that gas. The amount of gas actually provided during that year was only

3,692,072 dekatherms, and Northrop Grumman should have been billed only $3,821,294.50. Thus, during 2010 alone, Defendants overstated Northrop Grumman's gas usage by 1,599,921 dekatherms, causing Northrop Grumman to overpay by 30%—an excess of $1,655,918.

17.    Each month, Northrop Grumman paid the invoices to JADM in reliance on Defendants' false representation that Northrop Grumman had actually used the quantity of gas that JADM and Ramelmeier specified in the respective invoice. JADM received these payments. Ramelmeier, as JADM's owner, was enriched by JADM's receipt of the funds, and, on information and belief, received payments from JADM derived from those funds in an amount unknown at this time to Northrop Grumman.

18.    Northrop Grumman did not know or have reason to believe that Defendants were inflating usage rates.

**Northrop Grumman Discovers Defendants' Fraud**

19.    Northrop Grumman received a separate set of bills from BG&E for use of its infrastructure to deliver the natural gas. Although BG&E's bills were also based on actual metered usage, BG&E's billing procedures differed dramatically from JADM's such that it was extremely difficult to make contemporaneous comparisons of the usage JADM reported in its monthly invoices with the usage BG&E reported for the same period.

20.    In 2013, Northrop began using an outside company to compile utilities data, including natural gas invoice information from BG&E and JADM, into an EnergyCap ("EnCap") system. In December 2013, an environmental engineer pulled JADM data from a random summer month from the EnCap system and noticed an unusually high usage amount for a warehouse that used natural gas exclusively for heating purposes. Upon learning of the

discrepancy, Northrop Grumman retained an energy consulting firm, CQI Associates ("CQI"), to audit BG&E and JADM natural gas invoices from 2003 to the present.

21.     The audit revealed that JADM had exaggerated the usage it reported in virtually every monthly invoice it submitted to Northrop Grumman between 2003 and 2013. A summary, showing the amount of overcharges for each year between 2003 and 2013, is attached hereto as **Exhibit A**. CQI is currently reviewing additional documents covering the period from mid-1998 through 2003 and may identify further overcharges.

22.     Northrop Grumman has requested that Defendants repay the overages. Prior to Northrop Grumman's discovery of the fraud, Defendants did not correct these invoices or refund the overcharges to Northrop Grumman.

23.     Once Northrop Grumman brought the overcharges to the attention of JADM, JADM gave Northrop Grumman partial credit for overcharges during a portion of 2013, but has refused to repay the remaining balance due.

**Defendants' Fundamentally Dishonest Business Practices**

24.     Northrop Grumman has also uncovered numerous misrepresentations Defendants made in association with its agreement to supply natural gas to Northrop Grumman, some of which are detailed below. These misrepresentations were designed to conceal the fraud and lure Northrop Grumman into accepting and paying the false invoices.

25.     In addition to the ongoing scheme to overcharge Northrop Grumman through inflated usage numbers, Ramelmeier frequently concocted excuses to exaggerate invoice claims. On multiple occasions between 2007 and 2013, Ramelmeier advised Robert Stryjewski, a facilities engineer at Northrop Grumman's Linthicum facility who represented Northrop

Grumman in its contractual relationship with JADM, that Northrop Grumman should purchase surplus gas—some quantity in excess of the already inflated usage denoted on the monthly invoices—to avoid imbalance penalties. Ramelmeier maintained that any surplus would be credited to Northrop Grumman's account in subsequent months. These representations were false. Northrop Grumman and/or JADM were not at risk of suffering imbalance penalties from BG&E as represented by JADM, surplus gas was not purchased at the quantities represented by JADM, and surplus purchases were not credited in future bills. For example, in an email dated February 12, 2013, Ramelmeier proposed to Stryjewski that JADM would credit Northrop Grumman $15,000 per month to offset the extra charges arising from the purchase of surplus gas. However, JADM inflated the subsequent invoices so that Northrop Grumman did not actually receive any credits.

26.     Although Ramelmeier purported to reduce monthly invoices by credit amounts, he would correspondingly inflate reported usage numbers so that Northrop Grumman did not actually receive a credit. For example, despite $75,000 in credits Ramelmeier claimed to apply to Northrop Grumman's account in 2010, JADM still billed, and Northrop Grumman paid, $1,655,918 more than it actually owed.

27.     Defendants also misrepresented themselves to be a Northrop Grumman entity to secure natural gas commodities from suppliers on terms to which they would not have otherwise been entitled. Beginning in late 2012, JADM entered into three written contracts with UGI Energy Services, Inc. ("UGI") in which it falsely represented itself to be a Northrop Grumman entity. To enable and conceal the fraud, Defendants invented a fictitious Northrop Grumman employee named "Richard Shoe." On August 4, 2011 and August 15, 2012, Ramelmeier or

another person acting on behalf of JADM signed Richard Shoe's name to contracts with UGI, wrote "Director of Utility Management" as the signing party's title, and represented that Shoe was signing on behalf of a Northrop Grumman entity. Defendants also created a false post office box address for Northrop Grumman to which it instructed UGI to mail invoices, and opened an unauthorized checking account in Northrop Grumman's name for which they custom-designed counterfeit checks impressed with Northrop Grumman's letterhead and the false Northrop Grumman address. At Defendants' instruction, UGI mailed invoices to the false Northrop Grumman address and simultaneously emailed the invoices to Ramelmeier. Defendants submitted payments to UGI using the counterfeit checks from the unauthorized checking account. These false representations led UGI to believe that it was selling gas directly to Northrop Grumman.

28.     Ramelmeier falsely represented that JADM was a struggling small business with limited cash reserves. In September 2010, toward the end of a year in which Defendants would extract $1,655,918 in overages from Northrop Grumman, Ramelmeier wrote to Stryjewski asking to "defer any adjustments during the next contract year until Nov 11 due [to] the blend and extend, since JADM will be bearing the cost during that time period." In early January 2014, when Defendants had already fraudulently obtained at least $11 million from Northrop Grumman over a ten year period, Ramelmeier pleaded with Stryjewski to "return to [burning] gas" at its facilities, rather than oil, to "avoid putting JADM in a penalty situation with its supplier."

29.     Defendants lied to Northrop Grumman about JADM's status as a broker of natural gas. During negotiations with Northrop Grumman for contract renewals, Ramelmeier represented

that JADM was a broker for natural gas and that it was obtaining competitive pricing from natural gas suppliers on account of its broker status. However, JADM was not and has never been a registered or licensed broker with the State of Maryland.

30.     On May 16, 2014, representatives from Northrop Grumman met with Ramelmeier to discuss the overbilling and other deceitful business practices. Ramelmeier denied that he could provide any JADM records related to the contract, claiming all the records had been destroyed in a computer crash. Ramelmeier did not contest the overages but rather blamed the discrepancies on JADM employees. He admitted that he had created a fake identity under Northrop Grumman's name to secure a supply contract with UGI that he would not have otherwise been able to obtain.

**Defendants' Fraudulent Intent**

31.     The breadth of Defendants' deceit, encompassing regularly inflated metered usage extending over at least ten years and exceeding $10 million in cumulative value, provides clear and convincing evidence of Defendants' intent to defraud Northrop Grumman and demonstrates that Defendants renewed each contract with that fraudulent intent.

32.     JADM knew that its invoices were inaccurate, or knew that it could not determine whether its invoices were accurate. JADM had represented to Northrop Grumman that it was reviewing and synthesizing BG&E and/or supplier records to be able to present to Northrop Grumman an accurate and simplified description of the actual usage of natural gas by Northrop Grumman. Northrop Grumman relied on JADM's representation that JADM was providing accurate invoices based on actual usage. JADM either relied on BG&E or supplier records to prepare false invoices, or prepared its invoices without regard to BG&E or supplier records. In

either case, JADM falsely represented that it was providing Northrop Grumman with accurate reports and invoices.

33.     Ramelmeier, on behalf of JADM, lulled Northrop Grumman into retaining JADM as a natural gas broker and renewing its contracts with JADM for brokerage services by falsely representing that Defendants were providing honest, reasonable, and competitive services tailored to Northrop Grumman's best interests.

34.     Knowing that Northrop Grumman would continue retaining JADM as its natural gas broker only if it believed it was receiving the best prices for its natural gas, Ramelmeier continually represented that Northrop Grumman was receiving significant savings on account of JADM's brokerage. For example, in a letter dated October 1, 1996, Ramelmeier represented that Northrop Grumman was receiving a 28% savings in natural gas on account of JADM "assuming responsibility to deliver you the gas rather than BG[&]E."

35.     Ramelmeier repeatedly promised that he would take every possible measure to lower Northrop Grumman's gas bills. In fact, Ramelmeier enticed Northrop Grumman to agree to a multi-year contract with JADM, rather than continuing with the month-to-month contract that had been in place between Northrop Grumman and JADM since 1996, by promising lower prices. In a May 4, 2000 letter to Stryjewski, Ramelmeier claimed that "[w]ith the contract in place, I can assure you of lower prices." When Stryjewski did not immediately agree to execute the contract, Ramelmeier persisted until Stryjewski acquiesced. In a letter transmitted May 8, 2000, Ramelmeier described soaring gas prices and reiterated that, "To avoid this situation in the future we need to get a contract so we can lock in prices at their lowest point each month and for longer periods when the long-term prices drop." In closing, Ramelmeier assured, "My objective

over the term of the contract is to keep your gas costs within your budget." Yet again on May 31, 2000, Ramelmeier urged Stryjewski to "get the contract in please so we can get some price relief," and promised that he would "do my damndest to see Northrop Grumman gets the lowest prices and lock it in for the coming winters."

36.     On numerous occasions, Ramelmeier represented that JADM was pocketing only modest profits on Northrop Grumman's natural gas purchases. For example, when Stryjewski pushed Ramelmeier for lower gas prices in 2010, Ramelmeier insisted that Defendants were already operating on a razor thin profit margin: "I hear you. I would like to get that price lower, but there are several variables I have no control over. . . . We only have a 4% margin in that price. To make discernible impact on the blended price, we would have to sell the gas at cost or below." In fact, during the course of 2010, Defendants inflated the natural gas invoices it sent Northrop Grumman by 30% on top of its actual profit margin.

37.     Ramelmeier was always quick to respond to Stryjewski's questions and promptly corrected any errors Stryjewski discovered. Indeed, when Stryjewski contacted Ramelmeier in December 2013 to report the discovered warehouse usage discrepancies, Ramelmeier responded by email assuring Stryjewski that "JADM would correct the billing and either credit Northrop [Grumman] or issue a refund."

38.     The extensiveness of the actions necessary to coordinate and perpetuate the fraud suggests that Ramelmeier must have had the assistance of other persons to carry out a fraud so extensive and long-lasting. Upon information and belief, Ramelmeier operated JADM with his son, Mark A. Ramelmeier. JADM periodically employed additional personnel to assist with operations, including accountants and contract attorneys. Ramelmeier made general references to

co-conspirators when Northrop Grumman approached him about billing errors. For example, in explanation for overbillings in 2013, Ramelmeier explained that his accountant did not include certain credits in Northrop Grumman's 2013 credit balance sheet because "the accountant was out of the country and unavailable to ask me about the situation." Some of these other people, on information and belief, agreed to conduct the fraud.

## COUNT I:    COMMON LAW FRAUD

39.    Paragraphs 1 through 38 of this Complaint are re-alleged and incorporated herein by reference as though set forth in full.

40.    Defendants regularly and systematically misrepresented to Northrop Grumman that the monthly invoices they submitted for payment reflected Northrop Grumman's actual usage of natural gas as supplied by JADM during the respective billing cycles. The invoices were false because they overstated the quantity of gas actually supplied to Northrop Grumman.

41.    Defendants prepared and submitted invoices to Northrop Grumman containing inflated usage rates knowing the statements were false or with such reckless indifference to the truth.

42.    Defendants intended that Northrop Grumman would pay JADM more than the amounts to which JADM was legally entitled in reliance on the false representations.

43.    Northrop Grumman relied on Defendants' false representations in paying JADM, and its reliance was reasonable and justifiable under the circumstances.

44.    Northrop Grumman has been damaged as a result of Defendants' actions.

45.    Defendants habitually engaged in dishonest and unethical business practices designed to obtain money from Northrop Grumman to which Defendants were not entitled.

Defendants' pattern of inflating invoices, together with numerous other instances of deceit designed to enable and conceal their inflated billing practices, demonstrates that Defendants acted in bad faith and with actual knowledge of the falsity of the metered usage stated in JADM's invoices or with "willful blindness" about the falsity. Their actions reveal a wanton or reckless disregard for the rights of others and constitute "legal malice."

## COUNT II:   BREACH OF CONTRACT

46.    Paragraphs 1 through 38 of this Complaint are re-alleged and incorporated herein by reference as though set forth in full.

47.    Between 1996 and 2014, Defendants and Northrop Grumman agreed that JADM would supply 100% of Northrop Grumman's daily natural gas requirements at specified ES facilities and submit monthly invoices to Northrop Grumman reflecting actual metered usage, and that Northrop Grumman would pay only for the natural gas it actually used.

48.    This agreement, as memorialized in numerous written contracts and reflected through continued monthly performance, constitutes a valid binding contract between Northrop Grumman and JADM.

49.    Northrop Grumman has performed or tendered performance in accordance the contracts.

50.    Defendants materially breached the contracts beginning no later than 2003 when it consistently submitted invoices that exaggerated usage and billed Northrop Grumman for more gas than Northrop Grumman actually used.

51.    Northrop Grumman has suffered damages as a result of Defendants' breach.

**COUNT III:  UNJUST ENRICHMENT**

52.     Paragraphs 1 through 38 of this Complaint are re-alleged and incorporated herein by reference as though set forth in full.

53.     By overbilling Northrop Grumman for natural gas services based on inflated usage rates, Defendants caused Northrop Grumman to pay for gas it never received.

54.     Defendants have retained the overpayments despite Northrop Grumman's request for repayment. Defendants should return the overpayments to Northrop Grumman, as it would be inequitable to allow them to keep payments for goods they did not provide.

55.     It would be unjust and inequitable for Defendants to retain the overpayments received from Northrop Grumman under these circumstances, where Defendants did not provide the gas for which they billed Northrop Grumman, concealed the fraud by numerous false statements and schemes, and have refused to return the overpayments despite acknowledging the errors they made.

56.     Northrop Grumman has an equitable claim to any assets or properties that were received by Defendants as a result of improper charges to Northrop Grumman and any assets or property that were derived therefrom.

**COUNT IV:  CIVIL CONSPIRACY**

57.     Paragraphs 1 through 38 of this Complaint are re-alleged and incorporated herein by reference as though set forth in full.

58.     Beginning no later than 1996, and continuing at least until May 2014, Defendant Rolf Ramelmeier and his son Mark Ramelmeier and/or other JADM associates, whose identities

are unknown at this time to Northrop Grumman, conspired to obtain money form Northrop Grumman to which JADM was not entitled.

59.     Each participant in the conspiracy knowingly agreed to engage, and did engage, in one or more overt acts in pursuit of the conspiracy. For example:

       a.     Between 2003 and 2014, Ramelmeier or someone working on behalf of JADM submitted monthly invoices to Northrop Grumman that falsely reported the gas usage by Northrop Grumman.

       b.     Between 2003 and 2014, Ramelmeier and/or another person working on behalf of JADM received payments virtually every month, deposited them to accounts on behalf of JADM, and received payments from JADM derived from the payments made by Northrop Grumman for the inflated amounts on the monthly invoices.

       c.     Ramelmeier or another person acting on behalf of JADM misrepresented JADM to be a Northrop Grumman entity to UGI by signing contracts on August 4, 2011 and August 15, 2012 that falsely purported to be signed by Northrop Grumman's Director of Utility Management, Richard Shoe.

       d.     Between August 2011 and August 2012, Ramelmeier or another person acting on behalf of JADM opened an unauthorized checking account and post office box in Northrop Grumman's name.

60.     Northrop Grumman was proximately damaged by the conspiracy and Ramelmeier's actions in furtherance thereof.

## PRAYER FOR RELIEF

61.     WHEREFORE, by reason of the forgoing, Plaintiff respectfully requests that judgment be entered in its favor against Defendants jointly and severally as follows:

a.      Monetary and/or compensatory damages to the extent allowed by law, not less than $10 million;

b.      Punitive damages due to Defendants' actions with malice and in bad faith;

c.      Reasonable attorneys' fees, expenses, and costs;

d.      Imposition of a constructive trust on all funds or property that can be demonstrated to be proceeds or profits made by Defendants through overpayments obtained by fraud or otherwise unlawful means as equitable property of Northrop Grumman;

e.      Such other and further relief as the Court deems just and proper; and

f.      All other relief to which Plaintiff shows it is entitled at law or in equity.

## DEMAND FOR JURY TRIAL

62.     Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.

Dated: December 5, 2014          By: /s/ Alan D. Strasser_____
Washington, DC                   Alan D. Strasser          Bar No. 12382
                                 Hannah W. Riedel
                                 Joshua S. Bolian
                                 ROBBINS, RUSSELL, ENGLERT, ORSECK,
                                     UNTEREINER & SAUBER LLP
                                 1801 K Street, N.W., Suite 411L
                                 Washington, DC 20006
                                 P: (202) 775-4500          F: (202) 775-4510
                                 Email: astrasser@robbinsrussell.com
                                 Email: jbolian@robbinsrussell.com
                                 Email: hriedel@robbinsrussell.com